UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRANK WILLIAM RACKLEY,

Petitioner,

v.

HUNTER V ANGLEA,

Respondent.

No. 2:18-cv-0948 MCE GGH P

FINDINGS AND RECOMMENDATIONS

*Introduction and Summary*

Petitioner, convicted of rape in a brutal series of two prostitute rapes, has filed a federal habeas corpus petition. The undersigned has thoroughly reviewed the Petition, Answer and Traverse as the issues discussed therein were significant. After that review, discussed at length below, the undersigned recommends that the petition be denied.

*Factual Background*

The facts of the case are important to understand the context of the issues presented. Those background facts are taken from the Court of Appeal Third Appellate District ("Court of Appeal") opinion in People v. Rackley, No. C072249, 2016 WL 6820387 (Cal. Ct. App. Nov. 18, 2016).

////

Defendant Frank William Rackley, Sr., forcibly raped C.M. and J.D., whom he picked up under the pretext of paying for sex. He also forcibly penetrated C.M.'s vagina and anus with his fingers. A jury convicted defendant of two counts of forcible rape (Pen. Code, § 261, subd. (a)(2))1 and two counts of forcible sexual penetration (§ 289, subd. (a)(1)). The jury also found defendant committed an offense specified in section 667.61, subdivision (c), against more than one victim. (§ 667.61, subd. (e)(4).) In a bifurcated proceeding, the trial court found defendant was previously convicted of robbery—a serious felony offense (§ 667, subd. (a)) and a strike offense within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d))—and he had served four prior prison terms (§ 667.5, subd. (b)). The trial court sentenced defendant to serve an indeterminate term of 120 years to life in state prison, plus a consecutive determinate term of 21 years, and imposed other orders.

\*\*\*\*

### *Rape of C.M. (Count 1-3)*

On June 22, 2011, C.M. was working as a prostitute on Watt Avenue in North Highlands. Around 10:30 p.m., defendant pulled up in a red pickup truck and told her to "get in." C.M. complied. Inside the truck, defendant agreed to pay $100 for sex, "basically a quickie," with the understanding he would have to wear a condom. C.M. then directed defendant to a nearby location to perform the agreed-upon sex act, but they both decided the location was too crowded. Defendant said he knew of a better place and drove to a secluded parking lot on Roseville Road. After they parked, C.M. said she would "get naked" as soon as she received her "donation." Without responding, defendant "jumped" on C.M., pulled her shorts down to her "mid thigh area," and "placed [her] into like a pretzel shape [with her] legs above [her] neck," holding her in that position with one hand as he penetrated her anus and vagina with the other hand. Defendant told C.M. she was "dirty and disgusting," among other insults. He then informed her that "he wouldn't pay for it anyways" and inserted his penis into her vagina without a condom. Without consenting to have sex with defendant, C.M. asked him to put on a condom. As she explained: "I was being raped. I didn't want to be raped and come back with HIV or any kind of other disease." Defendant refused, saying he knew she did not have any diseases because she asked him to use a condom.

After the rape, defendant left the truck cab through the passenger side door and walked a short distance away from the truck, where he either ejaculated or urinated on the ground. C.M. described: "I didn't see any fluid come out of him, but there was a shaking movement that he was doing with his hand, and at that time I was pulling my clothes back up as I was looking at him to see if maybe I could run or not run, but I decided not to run." When defendant returned to the truck, he offered to give C.M. a ride, apparently back to the location where he had picked her up on Watt Avenue. She decided to accept the ride, and having noticed defendant had a swastika tattoo on his chest, C.M. used white supremacist slang—"do I have your skin on this"—to ask for his assurance nothing else would happen to her.

Defendant responded: "Get the fuck out." C.M. got out. Defendant drove away, leaving C.M. to walk down Roseville Road in search of help. Eventually, she was able to flag down a passing car, the driver of which allowed her to use his cell phone and drove her to a nearby restaurant. A short time later, C.M.'s cousin arrived and drove her to the hospital.

C.M. was interviewed by police at the hospital. She revealed the details of the rape and described her attacker, but lied about working as a prostitute because she did not want to be arrested. C.M. declined to have a rape examination done when she was told the examination would be performed in Roseville. She explained she did not want to go that far for the examination and she did not believe defendant ejaculated inside of her, "so [there would be] no evidence to collect." About a month later, C.M. participated in preparing a composite sketch of the rapist. The sketch included a swastika tattoo on the left side of the rapist's chest and the letters "SAC" tattooed in a semi-circular formation on his stomach.

### Rape of J.D. (Count 5)

On July 22, 2011, J.D. was working as a prostitute on Watt Avenue. She was 16 years old. Around 11:00 p.m., she walked down Auburn Boulevard to Edison Avenue, where defendant pulled up in a red pickup truck. Defendant asked if she was "dating." J.D. said, "yes" and got in the truck. Defendant pulled onto the freeway. When J.D. asked where they were going, defendant told her to "sit back and relax." He then exited the freeway at Fulton Avenue and drove to a "dark area" near Del Paso Country Club. Defendant parked the truck, unzipped his pants, and placed his penis in J.D.'s mouth. She began to cry. Defendant then pulled J.D.'s underwear down and climbed on top of her. He lifted his shirt to his chin, revealing his tattoos, pinned her arms above her head, and then inserted his penis in her vagina. J.D. pleaded with defendant repeatedly, "please don't do this," which he ignored. A few minutes later, defendant ejaculated inside of her. He then removed his penis and said: "[S]hut up, bitch, or I'll slap you."

After the rape, defendant took J.D.'s cell phone and opened the passenger side door. Seeing some of his ejaculate was on the seat, defendant used a receipt that was in the truck cab to wipe it off, and then threw the receipt out the door. J.D. stepped out of the truck and asked for her phone back. Defendant drove off and threw the cell phone out the window a short distance away. After picking up her cell phone, J.D. ran until she came upon a gas station and saw a woman in the parking lot. She told the woman what had happened and was directed to a sheriff's department substation up the street. When J.D. arrived at the substation, she was "hysterical and sobbing." She reported the rape to a deputy in the parking lot and described the rapist, but lied about working as a prostitute because she was "scared [she] would go to jail." Another deputy drove J.D. to the crime scene, where the receipt was collected as evidence. J.D. was then driven to the hospital, where a rape examination was performed.

### *Defendant's Identity as the Rapist*

> Less than a week after he raped J.D., defendant was arrested in a parking lot next to his red pickup truck. The tattoos on defendant's chest and stomach matched those on the composite sketch prepared based on C.M.'s description of the rapist. C.M. also described a small crack in the truck's rear view mirror that matched the truck.

> About two months later, C.M. identified defendant in a photo lineup, noting next to his photograph: "[T]his is the man that raped me."

> At trial, both C.M. and J.D. identified defendant as the rapist. While C.M. was at first unable to identify anyone in the courtroom as the rapist, a short time later, she stated: "I'd like to take—take it back. I believe that's the man right here." Identifying defendant, she stated: "Yeah. Yeah. That's the man."

> Defendant's DNA also matched that of a sperm fragment collected during J.D.'s rape examination.

People v. Rackley, 2016 WL 6820387, at *1-3.

*Issues Presented*

Petitioner raises the issues here which were raised on direct appeal. Statement of the issues has been somewhat shortened and set forth as petitioner's contentions:

1. Introduction of Unduly Prejudicial Evidence—the Tattoo;

2. Ineffective Assistance of Counsel—Failure to Ask for a Change of Venue

3. Failure to Dismiss Juror 7

4. After Juror Replacement, the Jury Failed to Begin Deliberations Anew

5. Failure to Respond to Jury Request No. 3;

6. Denial of Motion to Sever;

7. Introduction of the Complaining Witness' Age; and

8. Exclusion of Complaining Witnesses' Prior Crimes

*AEDPA Standards*

All merits issues in Section 2254 cases for which the state courts have ruled are viewed through the prism of AEDPA. The well recognized standards are set forth below:

The statutory limitations of the power of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The text of § 2254(d) states:

4

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir.2013) (citing Greene v. Fisher, 565 U.S. 34, 39 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir.2011) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)). Circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 63-64 (2013) (citing Parker v. Matthews, 587 U.S. 37, 48 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id.

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, supra, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, supra, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S.

465, 473 (2007); <u>Lockyer</u>, <u>supra</u>, 538 U.S. at 75 (it is "not enough that a federal habeas court, 'in its independent review of the legal question,' is left with a 'firm conviction' that the state court was 'erroneous.'") "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Harrington</u>, <u>supra</u>, 562 U.S. at 103.

The court looks to the last reasoned state court decision as the basis for the state court judgment. <u>Stanley</u>, <u>supra</u>, 633 F.3d at 859; <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "[Section] 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" <u>Harrington</u>, <u>supra</u>, 562 U.S. at 100. Rather, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Id.</u> at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." <u>Id.</u> at 99-100. Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a "federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits." <u>Johnson v. Williams,</u> 568 U.S. 289, 293 (2013). When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. <u>Stanley</u>, <u>supra</u>, 633

////

6

F.3d at 860; <u>Reynoso v. Giurbino</u>, 462 F.3d 1099, 1109 (9th Cir. 2006); <u>Nulph v. Cook</u>, 333 F.3d 1052, 1056 (9th Cir. 2003).

The state court need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at its decision. <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). <u>Stanley</u>, <u>supra</u>, 633 F.3d at 860; <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." <u>Id.</u> at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." <u>Harrington</u>, <u>supra</u>, 562 U.S. at 98. A summary denial is presumed to be a denial on the merits of the petitioner's claims. <u>Stancle v. Clay</u>, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." <u>Harrington</u>, <u>supra</u>, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" <u>Id.</u> at 101 (quoting <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009)). Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> at 102 (citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003)).

With these principles in mind the court turns to the merits of the petition.

////

*Discussion*

    A.  <u>Introduction of Unduly Prejudicial Evidence—the Tattoo</u>

    The trial court denied a pretrial motion to exclude the specific identification of a swastika tattoo on the body of petitioner.  As related in the facts, petitioner had shown this body marking to the victims/complaining witnesses.  Petitioner believes that the swastika is so hateful, <u>see</u> ECF No. 2 at fn. 3, that no matter the relevance, due process was violated by its admission.

    Petitioner seemingly briefs the issue in part as if this court were free to apply federal lower court precedent, or to go its own way if it believes a "really serious" violation of due process occurred.  As set forth in the AEDPA standards, petitioner must cite to a United States Supreme Court case which holds upon the precise issue presented.

> Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable. *Musladin,* 549 U.S. at 77, 127 S. Ct. 649.
>
> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, *see Williams*, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." *Musladin*, 549 U.S. at 77, 127 S.Ct. 649.  Under the strict standards of AEDPA, *we are therefore without power to issue the writ on the basis of Holley's additional claims.*

<u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 fn. 2 (9th Cir. 2009) (emphasis added) (noting that if it were free to rule on the issue, the Ninth Circuit would have found a violation of due process.) <u>See</u> <u>also</u> <u>Mejia v. Garcia</u>, 534 F.3d 1036, 1046 (9th Cir. 2008); <u>Alberni v. McDaniel</u>, 458 F.3d 860, 866 (9th Cir. 2006); <u>Soojian v. Lizarraga</u>, 2018 WL 3155617 (E.D. Cal. June 25, 2018); <u>Jones v. Spearman</u>, 2018 WL 424402, *4 (N.D. Cal. Jan. 16, 2018); <u>Garcia v. Madden</u>, 2018 WL 910184, *15 (C.D. Cal. Jan. 5, 2018).

    <u>Holley</u> and its progeny did not hold that if the court believes a serious due process

violation exists, it is free to rule on the issue of admission of prejudicial evidence. "Without power to rule" means just that— it does not mean "sometimes has the power to rule and sometimes not." Thus, it does not matter whether the evidence analysis of the Court of Appeal was spot on, dubious, or extremely unreasonable. No cognizable federal claim exists. Petitioner cites Dawson v. Delaware, 503 U.S. 159 (1992) for the proposition that overtly prejudicial evidence may be a due process violation. However, the difference between Dawson and the instant case, as well as the cases cited above, is that the Aryan Brotherhood evidence introduced in Dawson was *totally irrelevant* as well as prejudicial. Dawson found the due process violation because of the lack of relevance, not simply because it was prejudicial. Petitioner does not contest the relevance of the evidence herein—just that it was prejudicial. Relevance makes all the difference as to whether one can state a federal claim in habeas involving the admission of prejudicial evidence.

Petitioner further argues in the traverse that if the prejudicial evidence admission would result in a fundamental violation of due process, it is actionable in federal habeas. Such an argument blows a hole in Holley, et al., so large that Holley would stand for nothing. That is, in federal habeas the *sine qua non* for any alleged due process error is that it resulted in a fundamental violation of a fair trial, as there is no such thing in criminal prosecutions as a "slight" violation of due process as opposed to a due process violation involving fundamental fairness. All due process violations stemming from state criminal prosecutions by definition violate some fundamental fairness. If all petitioner had to do was label his asserted evidence admission error as one involving "due process," a federal claim would be stated every time. Petitioner's citation of Estelle v. McGuire, 502 U.S. 62, 70, (1992), does not assist his case as Alberni, supra, expressly held that Estelle had reserved the issue of whether the admission of prejudicial evidence could result in a cognizable due process claim in federal habeas. Alberni, 458 F.3d at 866. The undersigned is not free to ignore that holding.[1]

---

[1] Petitioner cites to Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998) for the proposition that unduly prejudicial, evidence admission, due process errors may be reviewed. […continued] However, Merkle was not an AEDPA case, and it cited to non-AEPA cases for this rule. Thus, it does not stand for authority that the Supreme Court has recognized a due process claim for

9

1    This claim should be denied.

2    B.  <u>Ineffective Assistance of Counsel—Failure to Ask for a Change of Venue</u>

3    Petitioner correctly packages his prejudicial venue claim based on violation of state law in

4    an ineffective assistance of counsel context as that is one of the few instances where a violation of

5    state law may be assessed in federal habeas.  The discussion by the Court of Appeal is, of course,

6    the focus in an AEDPA case.

7                                                  **A.**

8                                       *Additional Background*

9    This case generated some pretrial publicity.  According to
     defendant's motion for new trial, the publicity was "substantial" and

10   the fact J.D., a minor at the time she was raped, "was incarcerated
     prior to trial on a material witness warrant ... aroused much public

11   controversy and was covered extensively in local media."  Ruling on
     the new trial motion, the trial court disagreed with defendant's

12   characterization of the coverage, explaining: "Although there was
     some pretrial publicity, it was not particularly extensive.  Any issue

13   concerning knowledge of the case by any potential juror was
     resolved in voir dire.  There is no showing that any juror was in any

14   way affected by any pretrial publicity.  [¶] Counsel presenting the
     new trial motion has failed to present anything other than a bare

15   assertion that trial counsel was deficient in failing to make [a change
     of venue] motion.  The Court finds no deficiency on the part of trial

16   counsel."

17   A review of the record of voir dire supports the trial court's
     assessment as to the extent of the publicity.  Only three prospective

18   jurors acknowledged hearing about the case through the media, and
     each expressed an understanding that only evidence presented in

19   court could be considered.  After the jury was selected, before any
     evidence was presented, the trial court instructed the jury: "You must

20   not allow anything that happens outside of the courtroom to affect
     your decision.  During the trial the do not read, listen to or watch any

21   news report or commentary about the case from any source." Two
     days later, the trial court instructed the jury: "I wanted to re-

22   emphasize the order that I have made that you cannot view any kind
     of publicity about the case; no media accounts at all, or read any

23   media accounts, anything like that.  [¶] There was an article in the
     Sacramento Bee.  I have saved that article.  At the end of the trial I

24   will give it to you, but you may not read any articles, discuss any
     articles.  Don't let anyone talk with you about anything they have

25   read, seen, or heard.  [¶] You all understand that?  [¶] You all

26   ─────────────────────────

27   admission of unduly prejudicial evidence.  In any event, <u>Merkle</u> at 1103, also held that if any
     permissible inference could be drawn from the evidence, it did not violate due process.  Clearly,
     the permissible inference from the tattoo evidence was its high relevance to the identification of

28   petitioner as the rapist.

understand the importance of it?" The jury answered in the affirmative.

## B.

### *Analysis*

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to effective assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid.*, quoting *United States v. DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness ... under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832–833; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.)

Defendant has not carried his burden. A trial court "must grant a motion for change of venue if 'there is a reasonable likelihood that a fair and impartial trial cannot be had in the county.' The phrase 'reasonable likelihood' in this context 'means something less than "more probable than not," ' " and 'something more than merely "possible.' " [Citation.] In ruling on such a motion, as to which defendant bears the burden of proof, the trial court considers as factors the gravity and nature of the crime, the extent and nature of the publicity, the size and nature of the community, the status of the victim, and the status of the accused. [Citations.]" (*People v. Proctor* (1992) 4 Cal.4th 499, 523 (*Proctor*).) In light of this standard, on the limited record we have before us on appeal, we cannot conclude any reasonably competent attorney would have moved for a change of venue in this case.

With respect to the gravity and nature of the charged offenses, serial rape is certainly very serious. However, these crimes are less serious than the rape, torture, and murder involved in *Proctor, supra*, 4 Cal.4th 499, in which our Supreme Court held a change of venue was properly denied. (*Id*. at pp. 514, 526.) With respect to the extent and nature of the publicity, we have virtually no evidence on the matter. As the party bearing the burden of proof regarding trial counsel's deficient performance, defendant should have offered evidence of the extent and nature of the publicity in his new trial motion. (*Id*. at pp.

524–525 [evidence of publicity included copies of newspaper articles, copy-notes from local television and radio broadcasts, and the results of a telephone public-opinion survey].) Without such evidence, all we have on appeal is the trial court's assessment, supported by the record of voir dire, that publicity was "not particularly extensive." With respect to the size and nature of the community, we note Sacramento County is far larger than Shasta County, in which the trial in Proctor took place, and as the court in that case explained: " ' "The larger the local population, the more likely it is that preconceptions about the case have not become imbedded in the public consciousness." [Citation.]' " (*Id.* at p. 525, quoting *People v. Jennings* (1991) 53 Cal.3d 334, 363.) Finally, on the question of the respective status of the defendant and the victims, neither defendant nor his victims were prominent members of the community.  And while this case apparently became controversial because J.D., a minor, was taken into custody on a material witness warrant, this circumstance does not make it reasonably likely a fair and impartial trial could not be had in Sacramento County.

Because defendant has not demonstrated any of the foregoing factors weighs in favor of granting a change of venue, he has failed to carry his burden of demonstrating his trial counsel acted unreasonably in declining to bring such a motion.  For the same reason, defendant has also failed to carry his burden of demonstrating prejudice.

People v Rackley, 2016 WL 6820387, at *4-5

The undersigned will not repeat a boilerplate discussion regarding the law of ineffective assistance of counsel, as that law has been set forth in the Court of Appeal opinion.  However, the determination of ineffective assistance is not determined *de novo* by the undersigned, but rather through the AEDPA prism—petitioner must show that the decision of the Court of Appeal was not one which could be condoned by "fairminded jurists."

There is a danger in raising ineffective assistance of counsel issues on direct appeal in that the issues are generally decided on the record.  There was no attempt by petitioner to submit additional evidence on direct review or in this habeas case, and no extra-record evidence would be permitted in this case absent a finding that the legal and factual rulings of the appellate court were AEDPA unreasonable.  Cullen v. Pinholster, 563 U.S. 170, 181-82 (2011).  Thus, petitioner's assertions about counsel's deficiencies in not making a venue motion will be based entirely on the record herein.

Petitioner cites to "RT 167," but this citation involves testimony from a witness and not pre-trial publicity issues.  ECF No. 2 at 18.  Rather, the references to pretrial publicity are to be

12

found in the appellate brief for the People.  See ECF No. 15-9 at 21- 22, 23.  For the most part, these references were simply admonitions to the potential jurors not to read or watch media reports of the trial.  See ECF No. 15-4 at 59, 237.  In the latter citation, the trial judge mentioned that she would save an article in the Sacramento Bee for the jurors' perusal after their trial work was finished, and again she admonished the jury not to review media reports about the trial.

The undersigned has reviewed every citation set forth in the appellate brief, repeated below, and finds them to be accurate:[2]

> Here, outside of appellant's assertion that the case "aroused much public controversy and was covered extensively in local media," there is nothing in the record supporting a finding that a change of venue was required.  To the contrary, the issue of pre-trial publicity was addressed by the court during jury voir dire. (1 RAT 74-76, 171, 236, 282; 2 RAT 310.) [footnote omitted.]  In total, four potential jurors noted that they may have heard something about the case in the news. (1 RAT 77-78; 2 RAT 310.) All four stated that they would be able to set aside what they had heard and judge the case on the evidence presented at trial. (1 RAT 77-78; 2 RAT 310-311.) One of the four was questioned by defense counsel regarding some perceived uncertainty regarding whether or not he would be able to set aside what he had heard. (1 RAT 152.) That potential juror was subsequently dismissed by defense counsel. (1 RAT 168.) The other three potential jurors that had mentioned possibly hearing some of the pre-trial publicity were dismissed by the court after the jury had been selected from the remaining potential jurors. Following the trial, the court noted that, "Although there was some pretrial publicity, it was not particularly extensive." (3 RT 727.) As such, there is no evidence that a motion for a change of venue would have been granted had it been raised[.]

ECF No. 15-9 at 23.

The above is the sum total of so-called "extensive" media coverage which trial counsel was supposed to bring up in a pre-trial motion.  Clearly, no reasonable counsel would bring such a motion on this very thin evidence of pretrial publicity.  No "presumed" or actual prejudice could arise based on the above facts:

> Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudical and inflammatory media publicity about the crime. *Rideau,* 373 U.S. at 726–27, 83 S.Ct. at 1419; *Murphy,* 421 U.S. at 798–99, 95 S.Ct. at 2035; *see also Sheppard v. Maxwell,* 384 U.S. 333, 352–55, 86 S.Ct.

---

[2] Augmented Reporters Transcript ("RAT") references are found at ECF Nos. 17 (RAT 1) and 15-7 (RAT 2).

1507, 1516–18, 16 L.Ed.2d 600 (1966). Under such circumstances, it is not necessary to demonstrate actual bias. *Estes,* 381 U.S. at 542–43, 85 S.Ct. at 1632–33; *Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir.1980), cert. denied, 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981) (quoting *United States v. Capo,* 595 F.2d 1086, 1090 (5th Cir.1979), cert. denied sub nom. *Lukefahr v. United States,* 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980)). The presumed prejudice principle is rarely applicable, *Nebraska Press Ass'n,* 427 U.S. at 554, 96 S.Ct. at 2800, and is reserved for an "extreme situation." *Mayola,* 623 F.2d at 997.

\*\*\*

Harris claims the responses of the jurors on voir dire revealed actual prejudice because 79% (81 of 103) of the prospective jurors questioned and 75% (9 of 12) of the petit jury were exposed to pretrial publicity. We disagree. *Actual prejudice is not demonstrated by a showing of exposure to pretrial publicity. "The relevant question is not whether the community remembered the case, but whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of the defendant."* Patton, 467 U.S. at 1035, 104 S.Ct. at 2891 (citing *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1642). The Supreme Court has indicated that a key factor in gauging the reliability of juror assurances of impartiality is the percentage of veniremen who "will admit to a disqualifying prejudice." *Murphy,* 421 U.S. at 803, 95 S.Ct. at 2037. The higher the percentage of veniremen admitting to a previously formed opinion on the case, the greater the concern over the reliability of the voir dire responses from the remaining potential jurors. *Id.*

Harris v. Pulley, 885 F.2d 1354, 1361, 1363 (9th Cir. 1988) (emphasis added).

The facts set forth in the record do not even commence to demonstrate a hint of saturated media coverage in the community. Nor does the record reflect at all that the jurors were unable to put aside any reports of the case they might have heard. The ineffective assistance of counsel claim for failure to bring a pretrial motion should be denied.

C. Failure to Dismiss Juror 7

This claim involves the belated recognition by a witness (a detective) and a juror that they lived in proximity to each other—several houses away from each other. The factual summary by the Court of Appeal is in all respects consistent with the facts proffered by the parties and will be relied upon here:

On May 3, 2012, Detective James Hoehn of the Sacramento County Sheriff's Department testified for the prosecution. The next day of trial, May 15, 2012, the trial court noted it had "received information from [the prosecutor] that he was contacted by Detective Hoehn, who

14

indicated that [Juror No. 7] contacted him after trial because he realized that he recognized ... Detective Hoehn as a neighbor, asked what he should do because he did not recognize the name on the witness list. [¶] Detective Hoehn contacted [the prosecutor], who advised Court and counsel."

The trial court then called Juror No. 7 into the courtroom for questioning. The juror explained: "Well, I'm terrible with names. I remember faces. I haven't lived in the neighborhood that long, so when I saw [Detective Hoehn] I recognized him. And then we kind of caught up with each other, and I said what do we do, and he goes, I got to call them and let them know, you know, we know each other, and —" The trial court asked how the juror "caught up" with the detective. Juror No. 7 explained Detective Hoehn came over to his house, knocked on the door, and said: "I was testifying, and I thought I recognized you as a juror. Are you a juror?" Juror No. 7 answered he was. The detective responded: "Well, I got to call them and let them know." There was no further conversation about the case. Juror No. 7 denied having any relationship with Detective Hoehn, other than recognizing him from the neighborhood, and stated recognizing him as a neighbor would in no way affect the juror's ability to be fair and impartial. After a brief sidebar, the trial court asked whether Juror No. 7 had gone to Detective Hoehn's house prior to the detective's arrival at his house. Juror No. 7 acknowledged he went to the detective's house to bring up the fact he recognized him, but when no one answered the door, the juror returned to his house. Detective Hoehn arrived at his house a short time later.

Defense counsel asked the trial court to dismiss Juror No. 7, noting the prosecutor's e-mail advising him of the contact between Detective Hoehn and Juror No. 7 indicated there had been "five or six times" in which the detective and the juror had spoken while living in the same neighborhood. Defense counsel argued: "I think that there is some relationship between the juror and the prosecution witness. I think that the juror was somewhat cagey in indicating that the detective had come to his house and originally omitting that he himself had gone to the detective's house first. [¶] I think there's no reason to have on the jury somebody who has some relationship with a prosecution witness. Although they don't seem to be friends, they do seem to be acquaintances, and for those reasons I don't think it's appropriate to have him as a juror."

In response, the prosecutor argued: "Your Honor, neither the detective [nor] the juror indicated they have any relationship other than they are neighbors and live a number of houses away. [¶] I'd also like to note that I would not agree that the juror was being cagey in any fashion. It just seemed to me the juror was unclear as to why the detective might have come and knocked on his door. [¶] As I indicated at sidebar and may have also indicated by email, the detective told me that he heard a knock on his door. He didn't answer the door as is his custom, but he did look out the window. He saw this man walking back to his house. At that point he put two and two together. Thought, well, now, I know why I recognize that juror in court. [¶] He went down to this man's house to see what it is he wanted, and that's how the contact occurred. So I don't believe

there's anything cagey on the part of this juror. I think he might not have known exactly the circumstances under which the detective came to his door; in other words, I don't think he knew the detective saw him walking back from his house."

The trial court ruled: "I think this juror has been very straightforward. He did not recognize the name, has no social relationship at all. When he realized he thought he might recognize him, he did what he thought he was supposed to do, and Detective Hoehn did what he thought he was supposed to do. They both realized that this is something that should be brought to the Court's attention. They did so. [¶] This juror indicated they have no social relationship. They don't really know each other that well, very casual and, certainly, there's nothing in the Court's opinion that causes the Court to believe that this juror should be replaced. He has done nothing wrong. He has not violated any admonition or in any way—acted in any way that the Court finds that he did not discharge his duties or would not continue to discharge his duties."

People v. Rackley, 2016 WL 6820387, at * 9-10.

The Court of Appeal then went on to analyze the situation which the undersigned discusses below.

First, however, the undersigned addresses an analytical miscue by petitioner. At the end of his Traverse argument, petitioner contends that he has supplied "clear and convincing evidence" that the Court of Appeal made an AEDPA unreasonable decision. Petitioner has made no such showing. This is not a situation where the Court of Appeal ignored facts, either of record or outside the record, which would have clearly and convincingly led to a different conclusion by reasonable jurists. Although juror bias is a question of fact, Patton v. Yount, 467 U.S. 1025, 1037 (1984) (citing Rushen v. Spain, 464 U.S. 114, 120 (1983) (state-court determination that juror's deliberations were not biased by ex parte communications is a finding of fact)), petitioner simply argues the legal inferences from the facts, i.e., that the undisputed facts should give rise to a finding of implied bias. Moreover, petitioner takes no issue with the fact-finding procedures of the trial judge—he just believes a different conclusion should have been reached. Finally, there is no issue of actual bias. That is, petitioner makes no legitimate argument from the facts that the juror' answers to the judge upon inquiry in and of themselves demonstrate an actual bias against petitioner.

////

Thus, the real factual argument here is the application of undisputed facts to a legal standard to arrive at the ultimate answer of whether the juror was sufficiently "impliedly" biased to be excused.  In this situation, whether viewed as an issue of fact or mixed issue of fact and law, petitioner had to show first that a cognizable claim for implied bas exists under AEDPA, and if so, the AEDPA unreasonableness of the ultimate conclusion drawing by the trial judge and Court of Appeal.

Secondly, the undersigned finds the following discussion from <u>Thomas v. Montgomery</u>, 2017 WL 2854396 (C.D. Cal. Mar. 1, 2017) (bracketed material added by the undersigned) and <u>Hedlund v. Ryan</u>, 854 F.3d 557 (9th Cir. 2017), to be instructive in this situation:

> A criminal defendant has a Sixth Amendment right to a "fair trial by a panel of impartial, 'indifferent' jurors." *Irwin v. Dowd,* 366 U.S. 717, 722 (1961); *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998). If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel." *United States v. Hendrix,* 549 F.2d 1225, 1227 (9th Cir. 1977); *Dyer*, 151 F.3d at 973.
>
> The relevant test for determining whether a juror is biased is whether the juror had such fixed opinions that he or she could not judge impartially the guilt of the defendant.  *See Davis v. Woodford,* 384 F.3d 628, 643 (9th Cir. 2004).  The Ninth Circuit has analyzed juror bias under two theories—actual bias and implied bias.  *See Estrada v. Scribner*, 512 F.3d 1227, 1240 (9th Cir. 2008).  Actual bias is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Fields v. Brown,* 503 F.3d 755, 767 (9th Cir. 2007).  "Unlike the inquiry for actual bias, in which we examine the juror's answers on voir dire for evidence that she was in fact partial, the issue for implied bias is whether an average person in the position of the juror in controversy would be prejudiced." *United States v. Gonzalez,* 214 F.3d 1109, 1112 (9th Cir. 2000) (citations omitted) (emphasis in original).
>
> ***
>
> Moreover, petitioner is not entitled to habeas relief under a theory of implied bias.  "There is no clearly established federal law regarding the issue of implied bias.  The Supreme Court has never explicitly adopted or rejected the doctrine of implied bias." *Hedlund v. Ryan,* 815 F.3d 1233, 1248 (9th Cir. 2016) [amended without change on this point in 854 F.3d 557, 575 (9th Cir. 2017)].  Accordingly, habeas relief is unavailable under this theory.  *Id*.; *see also Knowles,* 556 U.S. at 122; *Wright*, 522 U.S. at 126; *Brewer*, 378 F.3d at 955.

<u>Thomas v. Montgomery</u>, 2017 WL 2854396, at *9, 10.

Thus, petitioner once again has no viable claim under AEDPA.

Even if this court were inclined to go beyond this part of <u>Hedlund</u> to ask whether implied bias could be presumed from the facts above, <u>Hedlund</u>, a case involving a juror's belated awareness of distant relationship with one of the murder victims (much the same type of issue involved here), again supplies the answer:

> Although we have presumed bias on a rare occasion, we have based this finding on close relationships or the fact that a juror has lied. *See, e.g., United States v. Allsup*, 566 F.2d 68, 71–72 (9th Cir. 1977) (bias of bank teller employees presumed where defendant robbed another branch of same bank and tellers had "reasonable apprehension of violence by bank robbers"); *Green v. White*, 232 F.3d 671, 676–78 (9th Cir. 2000) (presuming bias biased on juror's pattern of lies). However, these cases are not clearly established federal law. In any event, nothing in the record suggests the Juror lied during voir dire or had a close relationship with McClain.

<u>Hedlund</u>, 854 F.3d 557 at 575.

There was no *close relationship* here between a juror who lived proximate to a witness, but who had no social connection with the witness; nor was there any legitimate evidence of lying on the part of this juror to conceal the real bias/motivation behind the need to lie. Implied bias cannot be presumed here.

Thirdly, even if the above were not enough to recommend denial of the claim, the analysis of the Court of Appeal with respect to actual bias was not factually or legally AEDPA erroneous:

> Section 1089 gives the trial court the authority to discharge a juror who, upon good cause shown, is found to be unable to perform his or her duty. "The determination of 'good cause' in this context is one calling for the exercise of the court's discretion; and if there is any substantial evidence supporting that decision, it will be upheld on appeal. [Citations.] A juror's inability to perform his or her functions, however, must appear in the record as a 'demonstrable reality' and bias may not be presumed. [Citations.]" (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1484; *People v. Beeler* (1995) 9 Cal.4th 953, 975, abrogated on another point as stated in *People v. Pearson* (2013) 56 Cal.4th 393, 461–462.)

> Here, the record reflects no demonstrable reality Juror No. 7 was unable to perform his duties as a juror. In response to the trial court's questioning, he explained his relationship with Detective Hoehn was virtually nonexistent. They lived in the same neighborhood, but had no social relationship. Juror No. 7 stated nothing about Detective Hoehn's status as a neighbor would affect his ability to be fair and impartial. The trial court found Juror No. 7's responses regarding his relationship with Detective Hoehn to be credible. We are bound by this credibility determination. (*See People v. Salcido* (2008) 44

18

Cal.4th 93, 133 [analogous situation of a for-cause challenge to a prospective juror; "such a determination involves an assessment of a prospective juror's demeanor and credibility that is " 'peculiarly within a trial judge's province" ' "].) In these circumstances, the trial court was within its discretion not to remove Juror No. 7 from the jury.

Nor are we persuaded by defendant's reliance on *People v. Hecker* (1990) 219 Cal.App.3d 1238, a case in which the Court of Appeal affirmed the trial court's decision to remove a juror after she informed the court the defendant came to her church the previous weekend and became a member. In response to questioning, the juror "was unable to give any assurance that she could decide the case without reference to her experience seeing [the defendant] join her church. 'I think it would bother me. I would be thinking about that, too,' she admitted." (*Id.* at pp. 1244–1245.) The appellate court held the record indicated, as a demonstrable reality, the juror was unable to perform her duty within the meaning of section 1089, explaining: "An admission by a juror that there is a significant likelihood extraneous matters will enter into the decisionmaking process is, in our view, sufficient to warrant removal of the juror and substitution of an alternate." (*Id.* at p. 1245.) Here, there is no such admission. As we have already explained, Juror No. 7 stated unequivocally Detective Hoehn's status as a neighbor would not affect his ability to be fair and impartial.

Defendant also takes issue with the way the matter was brought to the trial court's attention. He argues: "Instead of contacting Detective Hoehn at his home and engaging in the out of court private conversation, Juror [No.] 7 should have immediately contacted the court's bailiff at the very moment (during the in court proceedings) when the juror recognized that he knew Detective Hoehn. Likewise, Detective Hoehn should have immediately notified either the bailiff or the prosecuting attorney as soon as he realized that Juror [No.] 7 looked familiar. Further, Detective Hoehn (a trained law enforcement witness) should have refused to engage in any discussion with Juror [No.] 7 and simply directed the juror to contact the court." While defendant's suggestions as to a more appropriate manner of bringing the matter to the trial court's attention have some merit, the question on appeal is whether the record reflects, as a demonstrable reality, that Juror No. 7 was unable to perform his duties as a juror. For reasons already expressed, it does not. There was no abuse of discretion.

People v. Rackley, 2016 WL 6820387, at *10.

As observed by respondent, citing Johnson v. Williams, 568 U.S. 289, 306 (2013), the analysis of juror bias pursuant to Cal. Penal Code section 1089 is co-extensive with that of federal law. Given the thorough analysis by the Court of Appeal, no reasonable jurist could conclude that the appellate court was AEDPA unreasonable.

////

D.  Jurors Failed to Start Deliberations Anew

There is no issue here that after the case went to the jury for deliberations, a juror was replaced properly, and that the jury was instructed to start the jury deliberations over again. Petitioner believes that the jury disobeyed the instruction because of the short amount of time it took the jury to arrive at a verdict (approximately an hour and forty-three minutes).  Petitioner draws this inference because the jury had previously deliberated for close to three days prior to the juror substitution.  While the inference petitioner draws is reasonable, it is not the only reasonable inference which could be drawn.  Moreover, the undersigned must again start with the issue of whether the Supreme Court has established that failure of the jury to begin deliberations anew after a substitution is a violation of due process.

Irvin v. Dowd, 366 U.S. 717 (1961), holds that the right to jury trial is incorporated in the Fourteenth Amendment due process, and a later case held that all "essential features" of the right to jury trial must be preserved.  Williams v. Florida, 399 U.S. 78, 100 (1970).  However, no citation is made to a Supreme Court case that the "start again" principle is a matter of constitutional due process.  As then Magistrate Judge (now District Judge) Mueller found:

> Petitioner has cited no case nor has the court found Supreme Court authority requiring that such an instruction be given to the jury after an alternate has been substituted for a deliberating juror.  In *Peek v. Kemp*, 784 F.2d 1479, 1484-85 (11th Cir.1986), the Eleventh Circuit suggested that such an instruction is not constitutionally compelled.

Baca v. Scribner, 2008 WL 850309 (E.D. Cal. Mar. 28, 2008); see also Juarez v. Montgomery, 2019 WL 199987, at *8 (C.D. Cal. Jan. 15, 2019) (no constitutional requirement that the jury be instructed to recommence deliberations from the start); Salas v. Lewis, 2015 WL 179767, at *4 (C.D. Cal. Jan. 13, 2015).

As set forth in the AEDPA standards, a federal court adjudicating a Section 2254 habeas petition may not take a general rule enunciated by the Supreme Court and refine it to fit an assertion in the instant habeas proceeding.  Marshal v. Rogers, supra.  Here, the fact that the Supreme Court has enunciated a general rule that "essential features" of the right to jury trial be preserved does not permit an extrapolation to a refined rule that whenever a juror is substituted into a jury after deliberations have begun, the deliberations must recommence from scratch.  Nor

20

may a petitioner advance an argument that because a great number of federal courts apply such a rule (generally because of statute or rule), the Supreme Court would accordingly do so. Id. The claim in this section should be denied because of a lack of Supreme Court authority on the subject of starting deliberations anew after the substitution of a juror during deliberations.

Even if there were such a rule, the undersigned could not find the Court of Appeal's finding that the rule was not violated to be AEFPA unreasonable.

> There is no question as to the propriety of the juror substitution, to which both parties agreed. After the substitution, the trial court expressly instructed the jury, in accordance with *People v. Collins* (1976) 17 Cal.3d 687 (*Collins*): "One of your fellow jurors has been excused, and an alternate juror has been selected to join the jury. Do not consider this substitution for any purpose. [¶] The alternate juror must participate fully in the deliberations that lead to any verdict. The People and the defendant have the right to a verdict reached only after full participation of the [jurors] whose vote determines that verdict. This right will only be assured if you begin your deliberations again from the beginning. Therefore, you must set aside and disregard all past deliberations and begin your deliberations all over again. Each of you must disregard the earlier deliberations and decide this case as if those earlier deliberations had not taken place." The newly-constituted jury retired to the deliberation room and reached their verdict in 1 hour and 43 minutes.
>
> "In the absence of evidence to the contrary, a jury is presumed to have complied with the instructions given to it." (*People v. Crow* (1994) 28 Cal.App.4th 440, 446.) Here, the jury was specifically instructed to begin its deliberations anew. The only evidence defendant offers in support of his assertion the jury disregarded this instruction is the fact "the reconstituted jury reached a verdict in just one hour and forty-three minutes." From this, defendant argues "it is highly implausible deliberation began anew as required after the [substitution] and thus [defendant's] constitutional right to trial by jury was impinged according to [*Collins, supra*, 17 Cal.3d 687]." In light of the evidence of defendant's guilt, we see nothing implausible about the jury reaching a swift decision while adhering to the trial court's instruction to begin its deliberations anew.

People v. Rackley, 2016 WL 6820387, at *11.

As set forth at the beginning of this section, petitioner has supplied one reasonable inference from the facts of the accelerated verdict—accelerated after the juror substitution. But petitioner ignores other reasonable and conflicting inferences. "Starting deliberations anew" does not mean repeat the deliberations verbatim. It may well have been that the "old jury" which had wrestled with issues could start anew, but nevertheless arrive quickly to the spot when the

1   substitution took place. The "new juror" could very possibly not have needed more time to arrive

2   at a determination of the issues previously discussed. We all know about jurors who reach very

3   quick results, either expected or not. There is no time limit set for arriving at determinations.

4       That is why the Court of Appeal required other evidence to demonstrate that the

5   deliberations did not, in fact, commence from the beginning. The competing inferences from the

6   sole fact of speedy deliberation conflict, and essentially cancel each other. The Court of Appeal

7   was not AEDPA unreasonable.

8       This claim should be denied.

9       E.  <u>Failure of the Trial Court to Answer Question 3</u>

10      The Court of Appeal succinctly set the facts and conclusion for this claim:

> Finally, defendant contends the trial court prejudicially erred when it
> did not respond to a jury question (Jury Request No. 3) that was
> received before the juror substitution. Not so. As defendant himself
> points out in his previous argument, the jury was required to begin
> its deliberations anew after the substitution. Because of this, the trial
> court explained to the jury: "[Y]ou had sent a note out. The response
> is not going to be sent back because you need to start completely
> anew. So if you have some further request or request for testimony
> or any question, that would have to come from the newly-constituted
> jury. So that's why you're not receiving a response to your prior
> note." Thereafter, the jury submitted a new jury question (Jury
> Request No. 4), which the trial court appropriately answered.
> Defendant cites no authority, nor have we found any on our own,
> requiring the trial court to answer a jury question submitted prior to
> a juror substitution. To so hold would run contrary to the requirement
> the jury must begin its deliberations anew following such a
> substitution.

20  <u>People v. Rackley</u>, 2016 WL 6820387, at *11.

21      It is an open question whether a refusal to address a question, or a failure to do so because

22  of inadvertence sets forth a constitutional claim. A fairly recent case out of the Central District

23  found no constitutional claim. <u>Nevarez v. Felker</u>, 2012 WL 1835546, at *16 (C.D. Cal. Feb. 6,

24  2012). <u>Beardslee v. Woodford</u>, 358 F.3d 560, 574-575 (9th Cir. 2004) (a non-AEDPA case),

25  found the lack of a substantive response to a jury question to be a due process error. The lack of

26  clarity on this issue stems from the Supreme Court case, <u>Bollenbach v. United States</u>, 326 U.S.

27  607, 612 (1946), where the Court stated: "When a jury makes explicit its difficulties a trial judge

28  should clear them away with concrete accuracy." <u>Bollenbach</u> did not label its holding as one

required by the Due Process clause, but in fairness described the need for clarification answers to juror questions as an important duty of the trial judge.

The undersigned need not be detained by the above conundrum, but will assume for argument's sake that a failure to clarify a juror's question can be a due process violation.

The context of Questions 3 and 4 clearly show that no due process violation was involved. Prior to the juror substitution, Question 3 read:

> Can you please answer a question? If a prostitute is picked up by a client and not paid for service, does that constitute rape? What about the lack of use of a condom "if" that was requested prior to the act? What is the definition of prostitution?

ECF No. 15-1 at 224.

Jury Request No. 4 read as follows:

> 1) Can you please let us know in if nonpayment of a prostitute after the sexual act is rape? (If negotiated previously.)
>
> 2) If the use of a condom was mentioned and the person does not use one, does that mean it was nonconsensual?
>
> 3) Can we please get new verdict forms?

ECF No. 15-1 at 232.

The only substantive difference in the questions was that the first question asked for the definition of prostitution. However, petitioner does not relate why the definition of prostitution was important to this case. Prostitution was not a crime charged, nor was prostitution a defense to a charged crime. The newly constituted jury may well have determined the lack of importance of the omitted definition when it resubmitted Question 3 as Question 4. The Court of Appeal surely noted this fact as well when it held that a "new" jury was entitled to ask a new question if the rule about commencing deliberations anew was to have effect.

Moreover, even if the definition of prostitution was more than just an academic question, its relevance was so slight as to be totally harmless error in the scheme of things, i.e., it did not have a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619

////

23

(1993).  Again, the crime of prostitution was not something the jury had to find, and prostitutes can be raped.

This claim should also be denied.

F.  Denial of Motion to Sever

The Ninth Circuit has clearly held that no Supreme Court case has elevated the issue of severance to a due process violation.  "The Supreme Court has never held that a trial court's failure to provide separate trials on different charges implicates a defendant's right to due process."  Collins v. Uribe, 564 Fed. Appx. 343 (9th Cir. 2014) (citing Collins v. Runnels, 603 F.3d 1127, 1132 (9th Cir. 2010).[3]

Nor will the undersigned engage in the semantical argument that a certain claim does not raise a due process question unless the facts underlying the claim would give rise to a finding that "it denied a defendant a fair trial."   If such were the hallmark of an established Supreme Court holding, *every* claim of a denial of due process would be subject to AEDPA review on the merits in that the hallmark of a due process claim is that it denied a fair trial or was a fundamental error resulting in the absence of a fair trial.  Such an AEDPA-be-damned argument would essentially repeal that part of the statute which requires a specific Supreme Court holding.[4]

However, reasonable jurists and attorneys could view the footnote dicta in United States v. Lane, 474 U.S. 438, 446 n.8 (1986), as allowing a due process claim for fundamentally unfair joinder.  Even allowing this dicta to be considered a "holding," petitioner's claim still fails.  Without any discussion/analysis in the Petition or the Traverse, petitioner simply concludes that the evidence in one rape charge was weaker than in the other.

The Court of Appeal begged to differ:

> Relying exclusively on the third criterion, defendant argues: "Joinder is unduly prejudicial in that both cases, particularly that of [C.M.], are relatively weak.   There is no physical evidence supporting

_____

[3] Collins v. Runnels referenced joinder of defendants and not charges.  The end result is that under no definition of severance has the Supreme Court issued a definitive ruling.

[4] In a non-AEDPA case, the undersigned followed Ninth Circuit precedent on a prejudicial failure-to-sever claim in his Findings and Recommendations therein.  See Bean v. Calderon, 163 F.3d 1073, 1084-1086 (9th Cir. 1998).  In that case the undersigned was under no compulsion to identify a specific holding of the Supreme Court.

[C.M.'s] allegation of sexual assault and she sustained no physical injuries despite her allegation of violent assault. She was admittedly dishonest when denying to law enforcement that she was working as a prostitute at the time of the alleged assault. She has numerous prior convictions for providing false statements to authorities. Though both claims are relatively weak, [C.M.'s] is substantially weaker. As a result, the requested severance should have been granted." We are not persuaded. First, the fact C.M. had prior convictions for providing false statements to police cannot be used as a basis to claim the case against defendant with respect to Counts 1 through 3 was weak because, as we explain in part III C. of this opinion, these particular prior convictions were properly excluded from evidence. Second, and more importantly, while we acknowledge C.M. did not submit to a rape examination, lied to police about her occupation, and had prior convictions adversely affecting her credibility that were admitted into evidence, the case against defendant with respect to Counts 1 through 3 was quite strong. C.M. provided a detailed and accurate description of defendant, his tattoos, and his truck. She positively identified defendant out of a photo lineup. She did so again at trial. Moreover, defendant's rape of J.D., evidence of which was both overwhelming and cross-admissible under Evidence Code section 1108, was so similar to the rape of C.M. as to bolster her testimony the rape occurred as she claimed. Indeed, this is why the cross-admissibility "factor alone is normally sufficient to dispel any suggestion of prejudice and to justify [the] trial court's refusal to sever properly joined charges." (*People v. Soper* (2009) 45 Cal.4th 759, 775.) There was no abuse of discretion.

People v. Rackley, 2016 WL 6820387, at * 4.

It is difficult to even argue with this analysis of the evidence much less call it AEDPA unreasonable. Petitioner did not even try. The claim should be denied.

G. <u>Introduction of a Complaining Witness' Age</u>

The jury was permitted to hear evidence establishing the age of victim/witness JD at the time of her charged rape. Petitioner believes this evidence to have been of slight probative value but prejudicial in the sense that the jury would sympathize with her due to her circumstances at a young age. For the reasons set forth in section A, claims of admission of prejudicial evidence are not yet actionable in federal habeas.

H. <u>Exclusion of Victim/Witness' Prior Crimes Offered for Impeachment</u>

Petitioner argues that convictions of C.M. for giving false information to a police officer should have been permitted. He makes a similar prior crimes argument with respect to J.D. Clearly, these prior convictions would have been used on cross-examination of the victim/witnesses.

In <u>Davis v. Alaska</u>, 415 U.S. 308 (1974), the Supreme Court held that it was error under the *Sixth Amendment Cross-Examination/Confrontation Clause* to deny the defense effort on cross-examination to introduce the fact of a key witness' probation status for impeachment purposes.  <u>See</u> <u>also</u> <u>Delaware v. Van Arsdale</u>, 475 U.S. 673 (1986) (refusal of trial court to allow witness to be impeached with a dismissal of public drunkenness charge violated Confrontation Clause.)

Despite his argument, petitioner never raised the federal Confrontation Clause issue, nor actually, any federal issue.  Rather, on appeal to the California appellate and state supreme court, *and in his federal petition*, petitioner simply raises state law issues in support of his argument.  Never was the Confrontation Clause mentioned.  The undersigned went a step further to see if the state supreme court cases cited, <u>People v. Castro</u>, 38 Cal.3d 301 (1985) and <u>People v. Wheeler</u>, 4 Cal.4th 284 (1992), invoked the Confrontation Clause, but those cases, although involving the admission of prior convictions, were inapposite.  <u>Castro</u> involved use of prior convictions to impeach the *defendant*, and <u>Wheeler</u> contested the *admission* of impeachment evidence for a *defense* witness.

It was not until the Traverse that petitioner cited any federal cases, but these cases had to do with the *admission* of prejudicial evidence and/or exclusion of evidence on direct (defense case), not its exclusion on cross-examination.  <u>Estelle v. McGuire</u>, 502 U.S. at 70; <u>Rhoades v. Henry</u>, 638 F.3d 1027, 1034 n.5 (9th Cir. 2011); <u>Windham v. Merkle</u>, 163 F.3d 1092, 1103 (9th Cir. 1998).

Thus, the undersigned is faced with a situation where the correct federal claim has never been raised.  Certainly, it has not been exhausted.  Exhaustion involves giving the state courts the fair opportunity to rule upon the *specific* federal claim.  <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971).  And, the presentation of "similar" state claims is not sufficient for exhaustion.  <u>Duncan v. Henry</u>, 513 U.S. 364, 365-66 (1995).  This is not a situation where petitioner raised his federal claim, but the state courts ignored it.  <u>See</u> <u>Dye v. Hofbauer</u>, 546 U.S. 1 (2005).  If the undersigned were faced with simply an exhaustion question, the undersigned could hold the petition in abeyance while it was exhausted, or dismiss the mixed petition.  But, the Cross

Examination/Confrontation Clause federal claim has never been raised.  At this juncture, the undersigned finds it waived or forfeited.

Because the petition as written involves only state law issues, or a traverse as written raises inapposite federal "due process" issues, and because the proper claim is nowhere mentioned, this claim as stated should be denied.

*Conclusion*

Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1. The petition for writ of habeas corpus be dismissed with prejudice; and

2. The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 20, 2019

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE